FREDERICK M. FOX AND MICHELE B. FOX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fox v. Commissioner
Docket No. 23546-84.
United States Tax Court
T.C. Memo 1989-232; 1989 Tax Ct. Memo LEXIS 232; 57 T.C.M. (CCH) 383; T.C.M. (RIA) 89232; May 11, 1989. Frederick M. Fox, pro se. Miles D. Friedman, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioners' *234 Federal income tax for 1980 in the amount of $ 12,411.69 and an addition to tax under section 6653(a)[1] in the amount of $ 212.10. After concessions by both parties, [2] the issues remaining for decision are: (1) Whether petitioners are entitled to a deduction under section 461(g)(2) for points or prepaid finance charges during 1980; (2) Whether petitioners are entitled to business deductions for expenses and depreciation on three houses they owned and occupied at different times during 1980, which depends initially upon whether each property was a rental property during the relevant period; (3) Whether petitioners are liable for the negligence addition under section 6653(a); and (4) Whether the Court, on its own motion, should award damages to the United States under section 6673. *235 GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Frederick M. Fox and Michele B. Fox resided in San Juan Capistrano, California at the time they filed their petition in this case. In 1980, petitioners filed a joint Federal income tax return. They used the cash receipts and disbursements method of accounting and filed their return on a calendar year basis. During 1980, Mr. Fox was employed by American Airlines as an airline pilot. That year he received wage income of $ 79,118 from American Airlines. For convenience, the findings of fact and opinion will be combined below for each separate issue. I Points or Prepaid Finance Charges under Section 461(g)(2)
On September 19, 1980, Mr. Fox married his present wife, Michele Fox, and she moved into what had been his prior marital residence with his former wife, Susan Fox. That house is located on Branding Iron Road in San Juan Capistrano, California (referred to hereinafter as the "Branding Iron house" or "property B"). At that time the Branding Iron house was still held *236 by Mr. Fox and Susan Fox as tenants in common, the sale of that house contemplated in their 1979 divorce decree not yet having been accomplished. The record does not clearly disclose where Mr. Fox had lived in July and August of 1980, but it was either in the Branding Iron house or in Michele's house in San Clemente, California (hereinafter referred to as either the "San Clemente house" or "property C"). Mr. Fox had moved into the Branding Iron house no later than September 1, 1980, and by September 19, 1980, Mr. Fox and Michele Fox had decided to buy Susan Fox's half interest in that house. At that time the Branding Iron house was encumbered with a first trust, a second trust, and various other liens. Mrs. Michele Fox was not employed outside of the home. Because of his alimony payments, child support payments, and payments on another house (referred to hereinafter as either the "Encinitas house" or "property A"), Mr. Fox was financially overextended and had difficulty obtaining financing to buy Susan's interest in the Branding Iron house. Finally, on December 22, 1980, petitioners obtained a third trust from Precision Mortgage Service, Inc., in the principal amount of $ 118,600. *237 This was a six-month, interest-only loan, at an annual percentage rate (APR) of interest of 57.58 percent. Petitioners signed a note for the principal sum of $ 118,600, agreed to make five monthly payments of interest in the amount of $ 1,976.67 each month, the first such interest payment being due in late January of 1981, and to make a final balloon payment in June of 1981 of $ 120,576.67 (the $ 118,600 principal amount plus the sixth interest payment of $ 1,976.67). The total payments on this loan were to be $ 130,460.02, composed of the principal or face amount of the loan of $ 118,600 and the interest of $ 11,860.02. Stated another way, the total payments on the loan were to be $ 130,460.02, composed of an amount financed of $ 99,624 and interest or finance charges of $ 30,836.02 (the $ 11,860.02 plus an item of $ 18,976). Here "the amount financed" of $ 99,624 represents the principal or face amount of the loan less the $ 18,976 ($ 118,600 - $ 18,976 = $ 99,624). [3] That amount financed of $ 99,624 includes various fees and expenses, amounts of certain liens on the property to be paid off, an amount of $ 50,000 for Susan Fox, and a balance to the borrowers (petitioners *238 herein) of $ 38,507.24. The interest or finance charges included $ 11,860.02 for the six monthly interest payments (6 x $ 1,976.67) and the item of $ 18,976. There is no dispute that none of the $ 11,860.02 was paid in 1980. The dispute herein involves the proper characterization of the $ 18,976 and its deductibility vel non in 1980 under section 461(g)(2). On the Disclosure Statement of Loan, which is in evidence, the description of this $ 18,976 item is ambiguous, the printed form having two separate lines reading "Prepaid Finance Charge" and "Broker's Commission earned in full for services rendered" for this one figure. [4] Assuming, as we do for purposes of this case, that the $ 18,976 constitutes points, i.e., a prepaid finance charge, we must determine if the item is deductible in 1980 under section 461(g)(2). *239 Petitioners use the cash receipts and disbursements method of accounting. Section 461(g)(1) provides as follows: (g) PREPAID INTEREST. -- (1) In General. -- If the taxable income of the taxpayer is computed under the cash receipts and disbursements method of accounting, interest paid by the taxpayer which, under regulations prescribed by the Secretary, is properly allocable to any period -- (A) with respect to which the interest represents a charge for the use or forbearance of money, and (B) which is after the close of the taxable year in which paid, shall be charged to capital account and shall be treated as paid in the period to which so allocable. Thus, the fact that interest is "prepaid" is not determinative; in fact, that is exactly the target at which the Congress was aiming. Section 461(g)(1) provides a general rule that a cash basis taxpayer must nonetheless amortize "prepaid interest" over the life of the loan as if he were on the accrual method of accounting. Section 461(g)(2), however, provides an exception to that general rule, to allow deductibility of points *240 in some instances: (2) Exception. -- This subsection shall not apply to points paid in respect of any indebtedness incurred in connection with the purchase or improvement of, and secured by, the principal residence of the taxpayer to the extent that, under regulations prescribed by the Secretary, such payment of points is an established business practice in the area in which such indebtedness is incurred, and the amount of such payment does not exceed the amount generally charged in such area. Petitioners seem to think the issue is whether or not the points can be labeled as "prepaid," hence their reliance on Regulation Z issued under the Truth in Lending Act. Petitioners' reliance on Regulation Z to establish payment is misplaced. The broad purpose of the Truth in Lending Act (TILA) and Regulation Z issued pursuant thereto by the Federal Reserve Board is to promote "the informed use of credit" and to enable consumers to compare more readily credit terms available to them. 15 U.S.C. sec. 1601 et seq. (1982); 12 C.F.R. sec. 226 (1982); Ford Motor Credit Co. v. Milhollin,444 U.S. 555, 559 (1980). The various TILA/Regulation Z requirements *241 for "meaningful disclosure" of credit terms have nothing to do with whether or not there has been a payment of interest or points for Federal tax purposes. That an item is treated as "paid" for purposes of Regulation Z and its detailed disclosure requirements is not determinative of the deductibility of points under the Federal tax law. What is determinative for Federal tax purposes is how the $ 18,976 was "prepaid" or "paid." Here, the loan proceeds actually delivered to the borrowers, petitioners herein, were $ 38,507.24. The $ 18,976 points or "prepaid finance charges," on the other hand, were simply subtracted from the face amount of the loan and withheld by the lender, Precision Mortgage Service, Inc. Thus, this case is indistinguishable from, and squarely controlled by, Schubel v. Commissioner,77 T.C. 701 (1981), and that line of cases. [5] In Schubel we clearly held that "prepaid finance charges" that are withheld by the lender, as in this case, are not points "paid" so as to entitle the taxpayers to a deduction for the full amount of such points in the year *242 withheld. The parties herein have not argued, and we do not consider, whether petitioners might be entitled to some allocable portion of the $ 18,976 for the month of December 1980. Cf. Beek v. Commissioner,80 T.C. 1024 (1983), affd. 754 F.2d 1442 (9th Cir. 1985); Zidanic v. Commissioner,79 T.C. 651 (1982). This was only a six-month loan, and all payments of interest thereon were in fact made in 1981. However, the interest must be allocated to the period with respect to which the interest represents a charge for the use or forbearance of money. Sec. 461(g)(1)(A). Here, the first period would be from about December 22, 1980 to January 22, 1981, and possibly later depending on when the closing actually occurred on this loan transaction. Thus, it is likely that any allocable portion for the few days in December of 1980 would be negligible. In Schubel v. Commissioner, supra, we pretermitted the issue *243 as to whether the indebtedness was incurred in connection with the purchase or improvement of the taxpayers' principal residence or incurred in connection with refinancing the loan. We have since held that the exception of section 461(g)(2) does not apply to a refinancing of one's principal residence. Huntsman v. Commissioner,91 T.C. 917 (1988). Here, Mr. Fox had owned a half interest in the Branding Iron house since he and Susan Fox purchased that house in 1969. This loan transaction in part constitutes a refinancing of the property and does not represent an "indebtedness incurred in connection with the purchase or improvement of, and secured by, the principal residence of the taxpayer" as required by section 461(g)(2). Only the portion directly relating to Susan Fox's interest in the Branding Iron house may so qualify. We cannot determine what amount, if any, so qualifies. Ultimately, after various encumbrances had been removed from the Branding Iron property, Susan Fox received about $ 38,000 in cash; she also received a $ 62,000 note secured by a deed of trust on the Branding Iron property, payable to her in a monthly amount of $ 554.32. It is not clear *244 whether she received these amounts under the loan in issue here, or under some later financing. Obviously, since this was a six-month, interest-only loan, there was a later refinancing of this loan transaction. Mr. Fox indicated at the trial that Precision Mortgage Service was supposed to renew the loan or obtain new financing for petitioners but reneged on the promise. Thus even if petitioners herein had directly "paid" the prepaid finance charges or points with their own separate funds, they still could not deduct the full $ 18,976 in 1980 under section 461(g)(2). On this record we cannot determine how much interest (including points) petitioners ever acutually paid on this Precision Mortgage Service loan. We find they paid none in 1980. For the reasons discussed above, we hold that petitioners are not entitled to deduct in 1980 any part of the $ 18,976 withheld from their loan by Precision Mortgage Service, Inc. II Rental Loss Deductions
1. Branding Iron House (Property B)
In 1969 Mr. Fox and his then wife, Susan Fox, purchased the Branding Iron property. It was a large property improved with a house, swimming pool, sauna, and barn and stables *245 for horses. Mr. Fox and Susan Fox and their three sons lived in the house. In November of 1978 Mr. Fox was ordered out of the house, and in 1979 he and Susan Fox were divorced. Susan Fox and the children continued to reside in the house. As part of the divorce decree, the Branding Iron property was to be sold, and the sales proceeds (after an initial amount to Susan to equalize the division of community property) were to be divided equally between the former spouses. Under the divorce decree Susan Fox was given exclusive use and possession of the property pending its sale, and she was ordered by the local court to make the first and second trust deed payments until the sale "as rent." Both Mr. Fox and Susan Fox were to share equally the payment of the taxes and insurance on the property until the sale. To facilitate the sale after the divorce, title to the property was changed from joint tenancy/husband and wife to tenancy in common with each owning a one-half interest therein. Susan Fox and one or more of the Fox sons continued to reside in the Branding Iron house until the end of June 1980, at which time they moved out. The record indicates that at least one month's trust *246 payments were delinquent at the time Susan Fox moved out. However, the record does not establish the amount of any first and second trust deed payments, if any, actually made by Susan Fox from January through June of 1980. She did not pay her share of the taxes and insurance on the property. In July and August of 1980, Mr. Fox spent some $ 3,929 for repairs, maintenance, and improvements on the Branding Iron property. In addition, he purchased a new carpet for $ 4,527, replacing the shag carpet that had been in the house since 1969. He also purchased new drapes for $ 1,034. Mr. Fox either lived in the Branding Iron house in July and August or moved in no later than September 1, 1980. He and Michele were married in that house on September 19, 1980 and by that time had decided to purchase Susan Fox's interest in the house (see Part I of this opinion above). They resided in that house thereafter and still lived there at the time of the trial. On their joint Federal income tax return for 1980, petitioners reported as rental income on property B an amount of $ 4,545 and claimed depreciation and expenses for eight months of $ 3,448 and $ 12,243, respectively, for a total rental *247 loss of $ 11,146. 2. Encinitas House (Property A)
After the divorce, Mr. Fox in May of 1979 purchased a house in Encinitas, California (property A) for $ 115,000. The Encinitas house was 1,800 square feet and had three bedrooms. At various times in 1979 and possibly up through June of 1980, two and sometimes three American Airlines flight attendants lived in that house. Although the fair rental value may have been somewhat higher, each flight attendant paid $ 235 per month, which was the most each one could afford to pay. One of them failed to pay her rent, and left owing some back rent. At some point all of the flight attendants moved out because they could not afford the rent for the house. The record does not establish either the exact periods of time the two or three flight attendants lived in the house or the total amount of rent they paid in either 1979 or 1980. The record does not establish when any one or all of the flight attendants moved out. Beginning in March of 1979, Mr. Fox had been based out of or flying out of Chicago, Illinois. While Chicago was where he was based by American Airlines, there is no evidence that he ever resided in that city either *248 in 1979 or 1980. The record is not clear as to exactly where Mr. Fox resided in the first half of 1980, but he spent some time at the Encinitas house and some time at a house in San Clemente, California (property C) owned by his then girlfriend, Michele. [6] Petitioners have not established that Mr. Fox spent fewer than 14 nights at the Encinitas house in the period from January through June of 1980. They have not established that he did not reside at the Encinitas house for a substantial portion of the period from January 1980 through the end of June 1980. See n.6, supra.
*249 Beginning in July of 1980, the Encinitas house was rented to and solely occupied by the Day family. The Day family paid rent of $ 535 per month for the house for the rest of the year. On their joint Federal income tax return for 1980, petitioners reported rental income of $ 5,288 from property A. Of that amount, at least $ 3,210 represented rental income received from the Day family for the second half of 1980. The Court cannot determine the amount, if any, paid by the flight attendants in 1980. Petitioners claimed depreciation of $ 3,794 and expenses of $ 14,477, for a total rental loss of $ 12,983 for property A. The depreciation deduction claimed for the house was based on a 12-month period and for the appliances and furniture a six-month period. 3. San Clemente (Property C)
Michele Fox owned a house in San Clemente, California (property C) which she received in the divorce from her former spouse. After she and Mr. Fox got married in September of 1980, she decided to sell property C. Apparently at some point a contract was entered into and the prospective purchaser, one Sue Luna, moved in before the closing. Ms. Luna was supposed to pay "rent" which at the closing *250 was to be treated as part of the purchase price of property C. Apparently, the check for her "rent" bounced, no amount was ever paid, and the property was not sold to Sue Luna. In 1981 the property was sold to another individual. There is little evidence in the record as to the details of Michele Fox's arrangement with Ms. Luna, and the Court disregards the ex parte statements made by Mr. Fox in his post- trial briefs. Rule 143(b); see n.6, supra.
On their joint Federal income tax return for 1980, petitioners reported zero rental income and claimed depreciation of $ 395 for four months and expenses of $ 530 for four months, for a total rental loss of $ 925 on property C. In the notice of deficiency, respondent disallowed the entire net rental loss of $ 25,054 claimed for properties A, B, and C. Since respondent only disallowed the net rental loss, petitioners' income was not increased by the purported rental payments reported by petitioners. Accordingly, the Court need not resolve any questions as to the amount of any payments made in 1980 by the flight attendants in regard to property A and whether Susan Fox made any payments in regard to property B. Also in the notice *251 of deficiency, respondent allowed as a Schedule A itemized deduction the taxes disallowed as a Schedule E expense. [7]
In 1980 Mr. Fox and/or Michele Fox owned three houses and lived in those houses at different periods of that year and claimed those houses as rental properties at other periods of that year. Generally speaking, the legal and factual problems presented by the three properties are to some extent problems of mixed personal and rental use arising under section 280A but *252 are more a matter of determining exactly when personal use ended and any putative rental use (held for production of income under section 212) began. Each property must be considered on its own particular facts for each period. As to property A, it is clear that this house was rented out to the Day family for the second half of 1980, and the Court concludes that petitioners are entitled to depreciation and expenses allocable to that period. However, we reach a different result for that Encinitas house for the first six months of 1980. Petitioners have failed to establish that Mr. Fox did not reside in that house for a substantial portion of the first half of 1980. See n.6, supra. Because petitioners have failed to provide any basis for any possible allocation under section 280A(e), we conclude that no rental loss deduction is allowable for that period. Again since only the net rental loss was disallowed by respondent and since taxes and interest, which are allowable as Schedule A itemized deductions, have been allowed, petitioners in effect have not been charged for any rental income for that period. As to property B, the former marital residence that Susan Fox and Mr. *253 Fox's sons occupied until June 30, 1980, we conclude that this property was never held for production of income under section 212. The local family court gave Susan Fox exclusive use and possession of the property until the sale thereof contemplated by the divorce decree was accomplished. Petitioners herein rely on the fact that the local court ordered Susan Fox to pay the first and second trust deed payments on the property "as rent" until the sale. That label does not make any such payments rental income or serve to convert the property to rental usage for Federal tax purposes. Moreover, the record does not even establish that Susan Fox made payments on the first and second trust deeds or the amount of any such payments purportedly made by her. Also, in claiming that the property was rental property, petitioners overlook the fact that the Branding Iron house was occupied by Susan Fox, a person who had an interest in the dwelling unit, and occupied by Mr. Fox's sons who would be considered members of his family as defined in section 267(c)(4). Section 280A(d)(2)(A) provides as follows: *254 (2) Personal Use of Unit. -- For purposes of this section, the taxpayer shall be deemed to have used a dwelling unit for personal purposes for a day if, for any part of such day, the unit is used -- (A) for personal purposes by the taxpayer or any other person who has an interest in such unit, or by any member of the family (as defined in section 267(c)(4)) of the taxpayer or such other person. Thus, Mr. Fox would be deemed, under section 280A(d)(2)(A), to have used the dwelling unit for personal purposes for the entire period of January 1, 1980 to June 30, 1980. As for the months of July and August of that year, when Mr. Fox was repairing and improving the property, we are not persuaded that petitioners either intended to convert the property to rental use or had in fact converted the property to rental use. Accordingly, we conclude that petitioners have not established that they are entitled to any rental loss deduction for property B in 1980. As to property C, that was the home of Michele and her daughter until Michele married Mr. Fox on September 19, 1980, moved into his prior marital residence (property B), and decided to sell her San Clemente house. At some point *255 between September 19 and early October 1980, a would-be purchaser, Ms. Luna, apparently moved into property C and was supposed to pay "rent" which at the closing was to be treated as part of the purchase price of the property. Ms. Luna's check apparently bounced, no amount was ever paid, and the property was never sold to her. Michele Fox did not appear at the trial to testify as to these matters, and the Court has disregarded Mr. Fox's ex parte statements made in his post-trial briefs. See nn.4, 6, supra. Petitioners have failed to carry their burden of proof to establish that they are entitled to deduct any depreciation and expenses for four months (September-December 1980) on property C. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). We are not suggesting that a property cannot be temporarily converted to rental use while awaiting sale. We simply point out that petitioners have failed to prove that that happened in this case. Petitioners have not established that at any time in 1980 property C was held for production of income under section 212. III Negligence Addition
At the commencement of trial, Mr. Fox orally conceded on the record *256 the negligence addition as it pertained to the Universal Life Church (ULC) deduction claimed on petitioners' 1980 return. As section 6653(a) provided in 1980, if "any part of any underpayment" of tax is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to five percent of the underpayment. Hence, under the concession, the negligence addition applies to the entire underpayment which will ultimately be computed in the Rule 155 proceedings. However, in petitioners' reply brief, they for the first time seek to be relieved of their concession of the negligence addition. That is entirely too late. The Court will not permit petitioners, long after the trial and when it is too late for respondent to develop the factual record further, to renege on their agreement. Moreover, respondent on the record made his acceptance of the concession of the ULC issue dependent on petitioners' agreement to concede the negligence addition pertaining thereto. Petitioners so agreed in open court. Had respondent put on the evidence in regard to *257 the ULC issue, that might well have supported not only the negligence addition but also an award of damages up to $ 5,000 under section 6673, as the Court had warned petitioners in its order to show cause issued before the trial. See Dew v. Commissioner,91 T.C. 615 (1988); Burwell v. Commissioner,89 T.C. 580 (1987), and cases discussed therein. Moreover, quite apart from petitioners' concession of the negligence addition as it pertains to the ULC issue, there is ample evidence to sustain an addition for negligence or intentional disregard of rules and regulations in this case. See n.2, supra, for the many other concessions in this case. In particular, petitioners claimed depreciation on the three properties based on the full cost of the properties, including the nondepreciable land. Petitioners were either negligent or intentionally disregarded rules and regulations in doing so. Thus, the Court is satisfied that the negligence addition is clearly warranted in this case, both under the concession and on the record of the case. IV Section 6673 Damages
The final issue in this case is whether the Court, on its own motion, should *258 award damages to the United States under section 6673. Section 6673, as it applies to this case, provides that: SEC. 6673. DAMAGES ASSESSABLE FOR INSTITUTING PROCEEDINGS BEFORE THE TAX COURT PRIMARILY FOR DELAY, ETC. Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless, damages in an amount not in excess of $ 5,000 shall be awarded to the United States by the Tax Court in its decision. Damages so awarded shall be assessed at the same time as the deficiency and shall be paid upon notice and demand from the Secretary and shall be collected as a part of the tax. Before the trial session, petitioners filed a frivolous tax protester document labeled "Notice of Revocation" which was treated as a motion to dismiss and denied. That document, plus petitioners' refusal to stipulate, prompted the Court to issue an order to show cause, in which the Court warned petitioners about damages under section 6673. Petitioners never properly *259 complied with the Court's pre-trial order or the Court's stipulation procedures under Rule 91. This resulted in a delay in the commencement of the trial while the parties virtually conducted an audit and orally stipulated to items that should have been disposed of long before the calendar call. At the calendar call, the Court admonished petitioners about their frivolous and groundless arguments and urged them to address any real tax issues in the case. Petitioners appeared to take the Court's warning to heart, the Court discharged the order to show cause, and petitioners proceeded to trial on the issues of the points and the rental loss deductions. [8]
*260 After trial petitioners filed their opening brief, a four- page document, with a fifth page containing only their signatures. Respondent filed a notice that he would file no reply brief. Petitioners then proceeded to file a 189-page reply brief and a 39-page "Memorandum in Support of Petitioners' Reply Brief" to which were attached numerous ex parte documents that are not part of the evidentiary record in the case. Rule 143(b); see n.4, supra.
Unlike the "canned" printed protester documents they filed before trial, petitioners' reply brief and memorandum contain tax protester arguments they have retyped on their word processor as an integral part of their reply brief and memorandum. These protester arguments are interlarded throughout the lengthy reply brief and memorandum, intermingled with and sometimes inseparable from, their discussion of the real tax issues in the case. Petitioners' analysis and discussion of the real tax issues and of the evidence of record are at times cogent and helpful to the Court. That is particularly true as to their analysis of the testimony of respondent's expert witness, whose testimony the Court has accordingly given little or no weight. *261 Such cogent and useful analysis persuades the Court that petitioners in fact are intelligent persons who know how to and can address the real tax issues when they choose to do so. Accordingly, the Court is wholly mystified as to why these intelligent individuals would waste their time and the time of this Court by resurrecting in their reply brief and memorandum frivolous tax protester arguments. [9] Petitioners have gone beyond their pre-trial frivolous arguments and indeed have added to their store of frivolous tax protester materials. *262 These tax protester arguments include the shop-worn tax protester themes that the tax laws are voluntary, that petitioners as "sovereign individuals" are not taxpayers, that they do not choose to make a "charitable contribution" to the Government in the form of tax payments, that the income tax applies only to Federal employees, that wages are either not taxable income or constitute an equal exchange for their labor, and that the Sixteenth Amendment somehow is invalid or did not change the prior law requiring apportionment among the states. Those stale arguments are legally frivolous and groundless. Wilcox v. Commissioner,848 F.2d 1007 (9th Cir. 1988), affg. a Memorandum Opinion of this Court; Rowlee v. Commissioner,80 T.C. 1111 (1983). Such frivolous and groundless arguments have resulted in an award of damages under section 6673 in other cases. Even where, as here, some legitimate tax issues remain to be decided by the Court, damages have been awarded to the United States against taxpayers who use the Tax Court proceedings to make such frivolous and groundless arguments. [10] That petitioners had been warned by the Court, appeared to have *263 heeded the Court's warning at trial in the Court's presence, and then resurrected and added to their frivolous arguments in their final brief satisfies the Court that damages should be awarded to the United States in this case. Accordingly, pursuant to section 6673, the Court, on its own motion, awards damages to the United States in the amount of $ 2,000. To reflect the parties' concessions and the above holdings, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioners orally conceded on the record at trial the unreported interest income of $ 9, the contributions deduction of $ 1,500 to the Universal Life Church, and the negligence addition under section 6653(a), as it pertained solely to the Universal Life Church issue. Respondent conceded the five personal and dependency exemptions, but the deficiency notice indicates that the five exemptions were allowed in the deficiency notice itself. Petitioners also conceded at trial a bad debt loss of $ 1,000, thus reducing petitioners' net short-term loss on Schedule D of their return from $ 18,136 to $ 17,136, which after allowance of the $ 3,000 capital loss deduction for 1980 left a short-term capital loss carryover of $ 14,136 to 1981. Both parties orally stipulated to adjustments to Mr. Fox's alimony payments; the total deductible amount agreed to by the parties was $ 10,000 rather than the $ 12,500 claimed on the return or the $ 1,224 allowed in the deficiency notice. On the rental loss issues, petitioners conceded in regard to property A the $ 563 renter's bad debt item, leaving total expenses of $ 13,914 substantiated to respondent's satisfaction. However, respondent does not concede petitioners are entitled to any rental loss deduction for property A or for the other two properties. However, if property A is held to be rental property, the parties agree that the proper basis for depreciation of property A is $ 63,250 rather than the $ 115,000 claimed on the return. As to the depreciation claimed for six months for appliances and furniture for property A, the parties stipulated that the $ 347 and $ 104, respectively, claimed on the return for these items were correct. For property C, the parties agreed that the proper basis for depreciation was $ 32,500 rather than the $ 50,000 claimed on the return. The $ 50,000 improperly included the cost of the land as well as the house. The parties stipulated that the expenses of $ 530 for property C had been substantiated. For property B, respondent does not concede that the property was "rented" at all and petitioners contend it was "rented" for at least six months of 1980. Petitioners, however, claimed on their return deductions for depreciation, interest, taxes, and insurance based on an eight-month period. The substantiated interest and taxes would be deductible Schedule A itemized expenses in any event. The total mortgage interest deductible on property B, whether on Schedule A or Schedule E, is $ 11,800.20. Petitioners argued on brief that Michele Fox had additional mortgage interest deductions on her house that were deductible on Schedule A, but there is no evidence in the record to support that contention. The Court must disregard the ex parte documents attached to petitioners' reply brief, such materials not being part of the evidentiary record in this case. Rule 143(b). For property B, the expense item of $ 1,350 for association dues has been substantiated. On Schedule E petitioners claimed tax expenses for the properties A, B, and C of $ 948, $ 824, and $ 348, respectively, totaling $ 2,120, which respondent disallowed as Schedule E expenses but allowed as Schedule A expenses and with the decrease of $ 145 for sales taxes and the decrease in other taxes of $ 45 resulted in the total additional Schedule A taxes of $ 1,930 allowed in the deficiency notice. Insurance in the amount of $ 234 for property B has been substantiated. From January 1, 1980 to June 30, 1980, an amount of $ 47 was expended for maintenance and repairs to property B. In July and August of 1980, petitioners expended $ 3,929 for repairs and maintenance on property B. Petitioners substantiated $ 73 of the $ 291 claimed for utilities and garbage for property B. The parties further agreed that the proper basis for depreciation of the house on property B is $ 42,250 rather than the $ 84,500 claimed on the return. The parties agree on the depreciable basis for the other items on property B as listed on the return, but disagree as to whether any depreciation deduction is allowable. On July 9, 1980 petitioners purchased a carpet for property B costing $ 4,527, with a useful life of five years, and they also purchased draperies on July 9, 1980 for $ 1,034, with a useful life of five years. If any depreciation is allowable on property B, additional amounts of $ 151 and $ 35, respectively, will be allowable for these items for July and August.↩
3. Under California usury statutes the interest rate is apparently recomputed by reducing the stated principal amount of the loan by the amount of any points paid. See our discussion of this practice in Russo v. Commissioner,68 T.C. 135, 146↩ (1977).
4. Despite the Court's admonition to Mr. Fox at the conclusion of the trial that he could not, on brief, go beyond the evidentiary record, he attached to his 39-page Memorandum in Support of Petitioners' Reply Brief various documents including additional documentation in regard to this loan. Those documents were not offered in evidence at the trial and are not part of the evidentiary record in this case. Rule 143(b). One of those documents clearly labels this $ 18,976 item as a "Loan Brokerage Commission." That would mean it was a payment for services rendered and hence no deduction therefor would be allowable, whether or not that amount was "paid" in 1980. However, the Court will disregard this ex parte document which is not part of the evidentiary record of this case, and for purposes of this opinion will assume that the $ 18,976 constitutes points or a prepaid finance charge.↩
5. See also Wetterholm v. Commissioner,T.C. Memo. 1986-189; Higgins v. Commissioner,T.C. Memo. 1984-330; Hager v. Commissioner,T.C. Memo. 1982-663↩.
6. These are matters that are peculiarly within the personal knowledge of Mr. Fox and Michele Fox. Michele Fox attended the calendar call but upon the request of Mr. Fox was excused by the Court from appearing at the trial because Mr. Fox represented that she would not be testifying and that she had no relevant testimony to give in the case. This is only one of several instances where her testimony would have been relevant to issues before the Court. When questioned about where he lived, Mr. Fox became increasingly more evasive and less forthcoming. While he admitted he spent some nights at the Encinitas house, he would not, despite repeated promptings, answer the question as to how many nights he spent there. When he perceived that this was an important area of inquiry, he tried to suggest he spent most of his nights at Michele's house. The Court found him lacking in candor and unworthy of belief. Since this is a matter as to which Mr. Fox and Michele Fox have personal knowledge, we think that Mr. Fox's evasiveness and his failure to have Michele Fox testify would warrant the Court in drawing a negative inference on the matter. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947). At the very least, petitioners failed to carry their burden of proof.
7. It is not entirely clear whether the deficiency notice also allowed as a Schedule A itemized deduction the interest disallowed as Schedule E expense, but apparently that has been done. The Schedule A interest deduction claimed was $ 29,668 including the $ 18,976 points that we have held (in Part I of this opinion above) is not properly deductible in 1980. The interest expense item was adjusted in the deficiency notice by disallowing $ 9,002 as not verified as paid for interest. Thus, it seems that some $ 9,974 additional interest has been added to the Schedule A interest, along with the disallowance of the $ 18,976. These matters can be verified by the parties in the Rule 155 proceedings.↩
8. The Court expressly stated, among other things, at calendar call: Now, I don't do this [warn about imposition of damages] to dissuade you from presenting any facts that relate to your proper tax liability because this Court doesn't want any taxpayer to pay one dollar more tax than he's required to under the facts of his case and the proper law. While the Court still subscribes to this view, petitioners have caused the Court to regret ever having voiced the sentiment. In their post-trial briefs, petitioners paraphrased the Court's statement, added language the Court never said, and proceeded to repeat their version, in quotation marks, over and over again throughout their lengthy post-trial reply brief and memorandum.↩
9. In addition to the protester arguments, petitioners, in their reply brief and memorandum, repeatedly make a truly astonishing argument that whenever they bring up a "new matter" respondent somehow under Rule 142(a) bears the burden of proof on that new matter. Petitioners also attack respondent's trial attorney in a wholly unwarranted and irresponsible manner. At the conclusion of the trial, the Court warned Mr. Fox that he could not go outside the evidentiary record on brief. He ignored that warning. Besides submitting ex parte documents, Mr. Fox tells the Court about telephone conversations that occurred after the trial and invites the Court "to corroborate petitioners' statement by calling Mr.    ." Petitioners, while purporting to voice respect for this Court, simply make a mockery of the Court and its proceedings. The Court is also not amused by the further waste of its time by Mr. Fox's silly word-processor games of "Fred 'The Red Baron' Fox" doing battle with "'Snoopy' Friedman."↩
10. See Cheek v. Commissioner,T.C. Memo. 1987-84 and the cases collated therein, particularly in nn.16, 17, and 18 therein. In that case another American Airlines pilot made similar frivolous and groundless arguments, and damages of $ 5,000 were awarded to the United States. See also Gibbs v. Commissioner,T.C. Memo. 1988-491; Hyslep v. Commissioner,T.C. Memo. 1988-289; Rager v. Commissioner,T.C. Memo. 1984-563, affd. 775 F.2d 1081↩ (9th Cir. 1985).